IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 7, 2011

**NORRIS E. RAY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**Nos. 02-02917-18     John T. Fowlkes, Jr., Judge**

**No. W2010-01675-CCA-R3-PC  - Filed November 30, 2011**

The petitioner, Norris E. Ray, appeals the post-conviction court's denial of his petition for post-conviction relief, arguing he received the ineffective assistance of counsel at trial and on appeal.  After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JEFFREY S. BIVINS, JJ., joined.

Paul K. Guibao (on appeal) and Andrew Hutchinson (at hearing), Memphis, Tennessee, for the appellant, Norris E. Ray.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of first degree felony murder, especially aggravated kidnapping, and unlawful possession of a handgun by a Shelby County Criminal Court jury and was sentenced to an effective term of life plus forty-four years in the Department of Correction.  On direct appeal, this court affirmed his convictions and sentences and the Tennessee Supreme Court denied his application for permission to appeal.  See State v. Norris Ray, No. W2004-01247-CCA-R3-CD, 2005 WL 1541785 (Tenn. Crim. App. June 27, 2005), perm. to appeal denied (Tenn. Dec. 5, 2005).  The underlying facts of the case were recited by this court on direct appeal as follows:

Kevin Wiseman and his brother, Jesse Windom, owned a car lot in Memphis. Mr. Windom called his brother around 6:00 p.m. on August 7, 2001, after the business was closed, and asked Mr. Wiseman to meet him at the car lot so he could get a set of car keys from Mr. Wiseman. Mr. Wiseman testified that Mr. Windom was driving a 2001 black Lexus. Mr. Wiseman arrived at the car lot and parked on the street. Mr. Windom backed the Lexus into the car lot's fenced parking area.

A white Dodge Stratus with three African-American males in it pulled up to the car lot. One of the men got out of the car and began talking to Mr. Windom. The man waved his hand for the second man to get out of the car. The second man approached Mr. Wiseman with a handgun. The third man remained in the Dodge. He stuck a shotgun out of the car's window and told Mr. Wiseman he would shoot him if Mr. Wiseman attempted to flee. The first man pulled up his shirt to show Mr. Windom that he was armed. Mr. Wiseman later identified [the petitioner] from a photo lineup as the first man who approached Mr. Windom, and [the petitioner]'s co-defendant, Nakomis Jones, as the man who approached Mr. Wiseman.

The men demanded the keys to the business office. Mr. Wiseman told [the petitioner] the keys were in his car, but [the petitioner] got into the Lexus instead and started the engine. Mr. Jones pushed Mr. Wiseman toward the Lexus, and told him to get into the trunk. Mr. Wiseman got into the trunk, and the car started moving. Mr. Wiseman heard one of the men ask his brother where the money was, and his brother responded that the police had taken all the money. The man kept repeating his demand, and Mr. Windom kept saying that he did not have any money. After driving for five to ten minutes, Mr. Wiseman heard a gunshot, and his brother said "oh."

Mr. Wiseman then heard one of the men say that he saw the police. The Lexus sped up and made numerous turns. The car stopped, and Mr. Wiseman heard the car's doors open and close. He waited about ten or fifteen minutes and then began pounding on the roof of the trunk. Mr. Wiseman did not know that the Lexus had an emergency release button inside the trunk, but he accidently hit the button with his arm. The trunk popped open, and Mr. Wiseman got out of the trunk. No one was around, and Mr. Wiseman did not see the Dodge Stratus.

Mr. Wiseman said that the car had stopped at the Southwood Apartments which were next door to the Flairwood Apartments. He called

Mr. Windom on his cell phone but did not get an answer. Mr. Wiseman caught a ride with a friend back to his business. Before they reached the car lot, however, Mr. Wiseman saw another friend at the intersection of Winchester and Tschulahoma. The friend told Mr. Wiseman that Mr. Windom had been shot and was in an ambulance at the Mapco gas station at the intersection. Mr. Wiseman said that his ordeal lasted about one hour.

On cross-examination, Mr. Wiseman said that he was in the car's trunk between fifteen and thirty minutes. Mr. Wiseman said that [the petitioner] was at the driver's side door when Mr. Jones put him in the trunk so he assumed [the petitioner] was driving the Lexus. Mr. Wiseman said that the only voice he could identify while he was in the trunk was his brother's.

Gary Claxton, a Memphis police officer, was off-duty on August 7, 2001. He was driving west on Winchester in a Nissan Maxima when a black Lexus and a white Dodge Stratus entered the road from an apartment complex and nearly struck his car. Officer Claxton said that the Dodge was following the Lexus, and both cars were being driven erratically. All three cars entered the left turn lane at the intersection of Winchester and Tschulahoma. The Lexus was first in line, followed by the Maxima and then the Dodge. A man jumped out of the rear passenger seat of the Lexus and ran toward a Mapco gas station. Officer Claxton said the man looked "panicked."

The Lexus made a u-turn and drove into the gas station. The light turned green, and the Dodge nearly hit Officer Claxton's car again. Officer Claxton let the Dodge pass him and recorded the car's license plate number. He called the dispatcher to report the incident. Officer Claxton said that he attempted to follow the Dodge and Lexus, but he did not see the cars again after they drove away from the Mapco. When he returned to the gas station, Officer Claxton said that the man who had jumped out of the Lexus was lying on the ground. It was later determined that the Dodge Stratus was registered to Chandra Jones.

Chandra Jones confirmed that she owned the Dodge. She said that she loaned the car to [the petitioner] on August 7, 2001, between 4:30 p.m. and 5:00 p.m. About 6:45 p.m., she called her cell phone which was in the Dodge, and a man named "Geno" answered. [The petitioner] later testified that "Geno's" name was Eugene Pickens. Mr. Pickens told Ms. Jones that [the petitioner] was in the bathroom.

Ms. Jones said that [the petitioner] returned to her apartment after she was asleep. The police called some time after midnight and asked Ms. Jones to step out of her apartment. Ms. Jones went outside, and the police took her to a telephone booth so that she could call [the petitioner] and ask him to come out of the apartment. Ms. Jones said that she did not see [the petitioner] arrested because the police would not take her back home.

Kim Hughes stated that she lives at the Flairwood Apartments. On the evening of August 7, 2001, her daughter and four other little girls were playing outside her apartment. A man, whom Ms. Hughes later identified as Nakomis Jones, approached her apartment around 6:30 or 6:45 p.m. and asked the little girls if he could use the telephone. Ms. Hughes came to the front door, and Mr. Jones told her that he had car trouble. Ms. Hughes told Mr. Jones to come to the back door, and she handed him her cordless telephone through the door. Ms. Hughes said that Mr. Jones kept dialing a couple of numbers and then hanging up. A second man, whom Ms. Hughes later identified as [the petitioner], walked up from behind the apartment building. Mr. Jones asked him for "brother's" telephone number. Mr. Jones still did not dial the telephone correctly, and [the petitioner] took the telephone from him and placed the call. Someone answered, and [the petitioner] said, "Geno, come and get us." [The petitioner] asked Ms. Hughes for the name of the apartment complex. [The petitioner] returned the telephone to Ms. Hughes, and the two men left.

Mr. Jones, however, returned to her apartment less than a minute later, and Ms. Hughes called 911. The police did not respond to her 911 call. Ms. Hughes saw a report of the shooting on the evening news and called Crime Stoppers.

Officer Prentiss Jolly with the Memphis Police Department responded to the dispatcher's call about shots fired at the intersection of Winchester and Tschulahoma. The victim had been transported to the hospital by the time he arrived. The investigating officers received notice while they were at the Mapco station that the victim had died. Officer Jolly interviewed Mr. Wiseman and Officer Claxton. He went to Chandra Jones' apartment and found the white Dodge Stratus in the complex's parking lot. Officer Jolly called Ms. Jones on the telephone and asked her to come out of the apartment in an effort to avoid a confrontation with [the petitioner]. Officer Jolly took Ms. Jones to a telephone booth down the street. Ms. Jones called [the petitioner], but he would not answer the phone. Ms. Jones then called [the

petitioner] on Officer Claxton's cell phone, and [the petitioner] answered. [The petitioner] and Ms. Jones talked for a few minutes, and [the petitioner] agreed to come out of the house. Officer Claxton said they were able to take [the petitioner] into custody without incident.

On cross-examination, Officer Claxton said that he had interviewed Dana Porter. He also had heard the name "Geno" mentioned in connection with the shooting, but he did not find anything linking him to the crime.

Mr. Jones' palm print was found on the outside rear door panel on the passenger side of the Dodge Stratus. [The petitioner]'s finger print was found on the driver's side window of the Dodge Stratus. Two of Mr. Windom's fingerprints were found on the Lexus.

Dr. Tom Deering, the interim medical examiner for Shelby County, stated that the cause of Mr. Windom's death was a gunshot wound to the abdomen. The bullet severed the right iliac artery and right common iliac vein causing severe internal hemorrhaging.

[The petitioner] testified in his own behalf. He said that he was at Ms. Jones' apartment on August 7, 2001 until around noon. [The petitioner] then went next door to his mother's house and spent the afternoon caring for her because she had recently had surgery. Around 4:00 p.m., he returned to Ms. Jones' apartment and told her he needed to get some fresh air. [The petitioner] drove Ms. Jones' Dodge Stratus to Mr. Pickens' apartment around 4:15 p.m. [The petitioner] said that Ms. Jones' kept calling him asking him to return her car. [The petitioner]'s brother, Marvin, came over to Mr. Pickens' apartment about thirty minutes after [the petitioner] arrived. [The petitioner] left the Dodge Stratus at Mr. Pickens' apartment complex, and [the petitioner] and his brother went to another brother's house where [the petitioner] met Daphne Love. [The petitioner] and Ms. Love drove to Dyersburg around 5:00 p.m and returned to Memphis at 10:00 p.m. [The petitioner] went back to Mr. Pickens' apartment complex and found that Ms. Jones had not retrieved her car. Mr. Pickens' girlfriend gave [the petitioner] the keys to the Dodge, and he drove to Ms. Jones' apartment.

[The petitioner] said that he answered the telephone when the police called Ms. Jones' apartment in the early morning hours of August 8, 2001. He said the police asked to speak to Ms. Jones because her car had been involved in a hit and run accident. [The petitioner] hung up the telephone, and the

police called back. Finally, [the petitioner] gave the telephone to Ms. Jones who went outside.

On cross-examination, [the petitioner] said that he had been sentenced to fifteen years on each of two prior burglary convictions. He said that he had seen Mr. Windom in the neighborhood but did not know him. [The petitioner] said that he spoke with several people in Dyersburg, including his brother, Anthony, and Ms. Love's mother. [The petitioner] said that Mr. Pickens was currently in the Shelby County jail. [The petitioner] said that his brother had attended his trial during the State's proof, but the trial court would not allow his brother to testify. [The petitioner] said that all of his family members were currently in Chicago attending his grandmother's funeral.

Id. at *1-4.

The petitioner filed a petition for post-conviction relief, as well as an amended petition, in which he raised, primarily, a number of allegations of ineffective assistance of trial and appellate counsel. The post-conviction court conducted an evidentiary hearing, at which the petitioner testified he was arrested on August 7, 2001 and had remained in custody since that time. Approximately two weeks after his arrest, he was appointed counsel to represent him at trial. The petitioner claimed that, from the time of his arrest in 2001 to his trial in 2003, he only met with trial counsel two times. The remainder of their communication was through letters. The petitioner was aware that trial counsel had an assistant who helped with the investigation of his case, but the petitioner never met or communicated with the investigator.

The petitioner testified that, during his meetings with trial counsel, he discussed what motions he wanted to file and that he wanted to present an alibi defense. The petitioner provided trial counsel with information regarding his alibi and the names and addresses of people who could verify it. However, trial counsel made no efforts to investigate his alibi defense. According to the petitioner, on the day of the offenses, he was at home with his mother waiting for an in-house nurse to arrive. When his fiancée returned home at 4:30, he went to a friend's house.

The petitioner testified that, "about the first of December," trial counsel gave him a copy of the State's motion for alibi defense that had been served on counsel on September 9, 2002. Prior to that day, the petitioner had given trial counsel information concerning his alibi, and the petitioner had filed a complaint against counsel on June 10, 2002, for failing to investigate his alibi defense. After receiving the State's notice for alibi from trial counsel, the petitioner wrote counsel, on December 5, 2002, a detailed letter providing information

-6-

about his alibi and the witnesses to investigate. The petitioner presented a certified mail receipt showing that the document was delivered. To the petitioner's knowledge, trial counsel never filed a response to the motion for alibi defense.

The petitioner stated that some members of his family were available to testify concerning his alibi until midway through trial when they had to leave to attend the petitioner's grandmother's funeral. Trial counsel was notified about the funeral, and the petitioner was assured that counsel would "get them on the stand before they had to leave town." The petitioner said that trial counsel, however, never called his family members to testify.

The petitioner testified that Dafany Love was one of the alibi witness names he gave to trial counsel. According to the petitioner, Love informed him that trial counsel's investigator had visited her on an unrelated matter, and Love had told the investigator that "she wanted to see [counsel] personally." The petitioner assumed that trial counsel had the ability to subpoena Love to be at his trial since her location was known to him, but Love was not at the trial.

The petitioner said that he decided to testify because trial counsel did not call any of his alibi witnesses. However, he acknowledged that he never told trial counsel prior to trial that he was not going to testify, and his testifying was always a possibility leading into trial. The petitioner said that he was cross-examined at trial concerning why he did not present any corroborating testimony regarding his alibi, and he responded that he had provided the information to trial counsel but counsel failed to bring the witnesses to court. The court "gave a curative instruction saying that both sides have subpoena power and only one side is required to do it." The petitioner believed that trial counsel should have objected to that curative instruction.

The petitioner testified that trial counsel failed to make several objections to the State's closing argument. He specified that trial counsel should have objected to the State's claim that the petitioner obtained the car keys from the victim because the testimony did not support that claim. According to the petitioner, the victim testified that he did not know where the petitioner obtained the keys. The issue was not raised on appeal.

The petitioner testified that the State also improperly commented on his post-arrest silence in closing argument, but trial counsel did not object and the issue was not preserved for appeal. In addition, the petitioner said that the State "repeatedly" misstated his prior criminal record in closing argument by indicating that the petitioner "had been convicted of aggravated burglaries and possession of handguns," when he actually had prior convictions for sexual battery and burglary.

The petitioner claimed that the trial court should have given additional lesser-included offense instructions, including one for criminally negligent homicide under the charge of second degree murder. However, trial counsel made no attempt to secure the additional instructions. Trial counsel never brought the petitioner a copy of the proposed jury instructions for him to review. The petitioner said that the jury instructions also improperly shifted the burden to the defense. He explained that the court instructed the jury that the State did not have to prove every element of the crime "if they find enough to satisfy them." The petitioner wanted trial counsel to object to the instruction, but he did not and the issue was not appealable.

The petitioner testified that the State, in its closing argument, went beyond the point of trying to enforce its theory that the offense was first degree murder to the point of telling the jury that anything less than first degree murder would be the equivalent of not guilty. He said that trial counsel did not object to the prosecutor's statement. The petitioner also testified that trial counsel failed to subpoena witnesses for the suppression hearing whose identifications of him had been documented on a videotape for a Court TV program. He wanted those witnesses to come to court "and make that identification again." The petitioner asked trial counsel to subpoena the witnesses, but counsel did not do so.

The petitioner testified that appellate counsel visited him in jail once, and they discussed the issues he wanted to appeal. The petitioner wanted to raise an issue regarding the suppression of a Court TV videotape that documented his arrest and identification. Appellate counsel asked the court for an extension of time in order to add the issue regarding suppression. However, the issue was never raised on appeal. The petitioner also complained that appellate counsel never relied on State v. Ely, which clarified jury instructions on lesser-included offenses.

On cross-examination, the petitioner recalled that the court conducted a jury-out hearing regarding the Court TV videotape. The petitioner said that he had never watched the video, but his family watched it and told him about it. The video showed the petitioner sitting in one room at the police station, and Kevin Wiseman in the next room making an identification from a photographic array. He asserted that the video also showed his arrest.

The petitioner testified that trial counsel relied on the defense of mistaken identification, and the petitioner testified at trial that he was somewhere else during the crimes. Expounding on his direct examination testimony, the petitioner said that he drove the car of his fiancée, Shandra Jones, to the home of his friend, Geno Pickens, on the day of the crimes around 4:30 p.m. The petitioner left Jones's car at Pickens' house, and the

petitioner's brother, Marvin Jackson,[1] picked him up from Pickens' house and took him to Marvin's house in North Haven, where he stayed "a short time." The petitioner acknowledged that the testimony at trial established that Jones's car was used in the offenses.

The petitioner testified that his friend, Dafany Love, picked him up from Marvin's house and drove him to Dyersburg. He estimated that it took them about an hour to get to Dyersburg. The petitioner said that, while in Dyersburg, they visited his brother, Anthony Jackson, and other people in the area. The petitioner admitted that the only people he named at trial as being in Dyersburg with him were Anthony and Love. The petitioner said that, in addition to his brother's house, they went to Love's house and then "to another place." He claimed that they arrived back in Memphis around 10:30 or 11:00 p.m. However, he later said that he could not remember when they got home and acknowledged that a letter he sent to trial counsel said that they had arrived home around 2:00 a.m.

The petitioner acknowledged that he was present in court on at least ten dates and would have spoken to trial counsel outside the courtroom on at least some of those dates. He also acknowledged that he spoke to trial counsel throughout the week-long trial. The petitioner said that trial counsel never wanted him to testify. He acknowledged that he testified at trial that the trial court "railroaded" him by not allowing him to present his alibi witnesses.

Leatha Scott, the petitioner's mother, testified that the petitioner was present with her earlier on the day of the offenses. However, neither trial counsel nor anyone from the public defender's office came to talk to her about the petitioner's whereabouts. Scott said that she was at the petitioner's trial but had to leave to attend her mother's funeral. Trial counsel had been informed that she was going to the funeral. However, Scott later testified that she was not present at all for the petitioner's trial. She said that her daughters, Deborah Ann Patterson and Diane Mitchell, and her sons, Ricky Scott and Marvin Jackson, attended the funeral with her. Anthony Jackson and Dafany Love did not go to the funeral.

Scott testified that she lived next-door to the petitioner's girlfriend, Shandra Jones, but she did not see the police arrest the petitioner because she was asleep. She explained that she had recently undergone surgery and had taken "some real strong pills and that put [her] to sleep."

---

[1] Some of the witnesses have the same last name and will be referred to by first name only at times for clarity. We mean no disrespect by this practice.

Marvin Jackson, the petitioner's brother, testified that, on the day of the offenses, the petitioner called and asked him to pick him up at Geno Pickens' house. He went to Pickens' where they all talked "for a minute." According to Marvin, the petitioner said that he was having some issues with his girlfriend, "Fay," and that he planned to go to Dyersburg that day. Marvin recalled that the petitioner told Pickens that "Fay" was going to come by to pick up her car and asked that Pickens give the car keys to "Fay." Sometime between 4:00 and 5:00 p.m., Marvin took the petitioner to Marvin's home in North Haven, which was twenty minutes away. The petitioner later spoke to Dafany Love on the phone, and she came to Marvin's house for "a few minutes." Love and the petitioner left his house around 5:00 or 6:00 p.m. Marvin talked to the petitioner later that night once the petitioner made it to the home of their brother, Anthony, in Dyersburg.

Marvin testified that he met with trial counsel prior to trial and counsel "led [him] to believe that he was doing all he could to represent [the petitioner] . . . in the best way that he possibly could. But he did just the opposite." Marvin stated that he told trial counsel that the petitioner was with him on the day of the offenses. He also told trial counsel that he and several of the petitioner's family members would be traveling to Chicago for a funeral during the week of the trial and wanted to be able to testify before they left. He said that trial counsel assured him that they would get a chance to testify before they left on Wednesday night but, when court ended for the day on Wednesday, counsel told Marvin that he was going to the back to talk to the petitioner and would be back, but he never returned.

On cross and redirect examinations, Marvin admitted that he was convicted in 2004 for being a convicted felon in possession of a handgun. He also had prior convictions for possession of a controlled substance with intent to sell, as well as driving offenses. Marvin clarified that, he contacted the petitioner in Dyersburg the night of the offenses by calling Anthony's cell phone. Marvin admitted that he did not go to the police when he learned that the petitioner was in jail to inform them that the petitioner had been in Dyersburg at the time of the murder. He acknowledged that he also did not attend the petitioner's preliminary hearing or arraignment to clear the petitioner's name. However, he said that he told trial counsel that the petitioner was with him on the day of the crime up until approximately an hour before it happened. Marvin claimed that he was present the first three days of trial, but he could not recall any specific witnesses who testified or remember watching any of it.

Dafany Love testified that she had recently been released from custody on charges of possession of cocaine and marijuana. She said that, on the day of the offenses, she met the petitioner at Marvin's house and took him to her house in Dyersburg. She said that it was about an hour's drive from Memphis to Dyersburg. While in Dyersburg, they drove around and talked to a few people, including Anthony Jackson. Love then drove the petitioner back to Marvin's house, dropping him off around 9:00 p.m.

Love testified that, at some point before the petitioner's trial, two investigators got her out of court and took her to the police department for questioning. Love said that she told the investigators that she was with the petitioner on the day of the offenses. She claimed that the investigators then said they were "not going to record [their conversation] and we[re] just going to act like this . . . never happened." Love stated that she spoke to trial counsel on the phone prior to trial, and he asked if she "was going to be able to come to court for [the petitioner]." However, she did not go to court because she was never "subpoena[ed] . . . with the court date and everything."

On cross-examination, Love acknowledged that she was an important alibi witness because she was with the petitioner at the time of the murder, but she did not come to trial because she "didn't get subpoenaed [and] didn't know the exact date." Love stated that, after she dropped the petitioner off at Marvin's house, he called her on her way home. Love elaborated that the two investigators who removed her from court were from the district attorney's office, and they took her to the police station in Dyersburg. Love denied telling the investigators that the petitioner was a friend of her incarcerated husband, that she had never talked to trial counsel, and that she could not remember the events of the day of the offenses.

Anthony Jackson, the petitioner's brother, testified that the petitioner and Dafany Love were at his house in Dyersburg from 6:30 or 7:00 p.m. until 8:30 or 9:00 p.m. on the day of the offenses. During the time the petitioner was at Anthony's house, their brother, Marvin, called looking for the petitioner. Anthony spoke to Marvin, but the petitioner did not because he "was in the back room." Anthony said that he told trial counsel that the petitioner was with him at the time of the offenses, and counsel was "supposed to . . . subpoena[] [him] to court, but [he] never got subpoenaed[.]" He did not go to court on his own accord because he was incarcerated in Dyersburg."

On cross-examination, Anthony admitted that he had several prior felony convictions for selling drugs and was presently incarcerated. He said that, on August 7, 2001, the day of the offenses, he was at his house all day selling cocaine. Anthony stated that he did not have any conversation with the petitioner and Love while they were at his house, and they stayed in the back room the entire time they were there. He acknowledged that he did not contact the police to tell them that the petitioner had been with him at the time of the offenses. He explained that the reason he did not contact the police on his brother's behalf was because he "was doing illegal things [him]self." However, he said that he called trial counsel in August or September 2002 and told him that he had been with the petitioner on the day of the offenses. Trial counsel told Anthony that he would subpoena him for trial, but he never did.

Ronnie McWilliams, a criminal investigator in the Gang Unit of the District Attorney General's Office, testified that, in 2004, he was assigned to interview Dafany Love with regard to this case as she was "supposed to be an alibi for [the petitioner]." McWilliams and another investigator, R.T. Goodwin, located Love in the Dyer County Jail and interviewed her. Love told them that, although she could not remember where she was on August 7, 2001, she knew that she was not with the petitioner. She told them that she and the petitioner had never had a relationship, and the petitioner was a friend of her husband, who was incarcerated. McWilliams and Goodwin informed Love that the petitioner's counsel had filed a notice stating that she would testify as an alibi witness for the petitioner, but she said that "she knew nothing about testifying." McWilliams said that he and Goodwin asked Love certain questions to test her memory and found her recall about dates to be correct. He recalled that Love was friendly during the interview. McWilliams and Goodwin prepared and signed a memorandum summarizing their interview with Love.

Trial counsel testified that he had practiced law for thirty years and that the majority of his practice was criminal defense. Trial counsel explained that, in addition to his private practice, he did part-time work for the public defender's office. As part of his work with the public defender's office, trial counsel served on the capital defense team, which was assigned the petitioner's case because it was not clear whether the State would seek the death penalty. When the State decided not to seek the death penalty, trial counsel opted to keep the petitioner's case because he had been working on it for so long, and he represented the petitioner until the end of the case. Trial counsel recalled that the petitioner and his co-defendant were tried together.

Trial counsel testified that he met with the petitioner prior to trial and had "a lot of face-to-face communication" with him. He visited the petitioner "[s]everal times" in jail and spoke with him at each of the approximately twenty court appearances. Trial counsel felt that he and the petitioner had a "pretty good" relationship and were able to communicate with one another. Based on the petitioner's assertions regarding where he was at the time of the offense, trial counsel planned to present an alibi defense at trial. The petitioner provided trial counsel with the name of Dafany Love for his alibi witness. Trial counsel's investigator went to Dyersburg to locate Love but was unable to find her.

Trial counsel testified that he was ultimately able to get in contact with Love because the State was able to locate her after counsel gave notice that he would be presenting an alibi defense. He explained that the State's investigators found Love when she appeared for court on a pending case. Trial counsel obtained a copy of the statement Love gave to the State's investigators and spoke to one of the investigators regarding the interview. Trial counsel's investigator also talked to Love, and they determined that Love would not be a good alibi witness because "she said she didn't have any knowledge of what we were talking about;

-12-

that she was not with him; she was nowhere around him. . . . [S]he totally denied the whole thing. So that's not an alibi." Trial counsel said that Love was the only alibi witness the petitioner provided.

Trial counsel testified that the petitioner's brother, Marvin, was not an actual alibi witness as he only saw the petitioner earlier on the day of the offenses and not at the time in question. Trial counsel said that, had Marvin been able to provide an alibi for the petitioner, counsel "would have had him under subpoena." Trial counsel did not remember speaking to anyone during trial who indicated they could provide the petitioner with an alibi. Trial counsel did not recall ever talking to the petitioner's brother, Anthony, or any members of the petitioner's family being present or talking to him during trial.

Trial counsel testified that he conferred with the petitioner throughout the entire trial, and the petitioner provided input. He discussed with the petitioner his right to testify and advised the petitioner not to testify, but the petitioner decided to testify. Trial counsel noted that the petitioner was identified by multiple witnesses during the trial as one of the perpetrators.

On cross-examination, trial counsel testified that the petitioner communicated that his brother, Marvin, had been with him at least part of the day of the offenses. Trial counsel's investigator talked to anyone the petitioner mentioned, and it was determined that Marvin was not an alibi witness or he would have been subpoenaed for the trial. Trial counsel was asked about a supplemental statement prepared by Officer Prentice Jolly on August 8, 2001, in which it was noted that Dana Porter saw the victim lying on the ground at a Mapco gas station but did not see the offense. Evidently, Porter opined that the killer may have been a person called "Junior." Trial counsel was sure that his office made efforts to find Porter.

Trial counsel testified that he filed a motion to suppress the identification of the petitioner from a photographic lineup, and the trial court conducted a hearing on the issue. He could not recall whether the witnesses who identified the petitioner were present at the hearing. He recalled that Sergeant Fitzpatrick testified at the hearing because "it was actually a Motion to Suppress the Photo Spread that was actually used to identify him is what it was." Trial counsel attempted to admit at trial a video from Court TV, but the trial court did not allow it.

Trial counsel acknowledged that the petitioner filed a complaint against him on June 10, 2002, with the Board of Professional Responsibility, but he explained that it was with regard to counsel's personal marital problems and not the way he was handling the case. He said that the Board summarily dismissed the complaint.

-13-

Trial counsel testified that the petitioner did not make any statements to the police prior to trial. He noted that, when a defendant elects to testify and has made no previous statements, prosecutors often point out that it is the defendant's first time telling anyone what happened. Trial counsel said that such tactics carry very little weight and objecting to the prosecutor's question would only draw more attention to it.

After the conclusion of the proof, the post-conviction court entered a written order denying relief.

## ANALYSIS

On appeal, the petitioner argues that the post-conviction court erred in denying his petition because he received the ineffective assistance of counsel at trial and on appeal. Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The same principles apply in determining the effectiveness of trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995).

## I. Allegations Against Trial Counsel

### A. Alibi Defense

The petitioner's first and primary argument is that trial counsel rendered ineffective assistance for failing to investigate all facts and circumstances supporting an alibi defense and presenting such defense at trial. Specifically, he asserts that trial counsel should have called Dafany Love, Leatha Scott, Marvin Jackson, and Anthony Jackson to testify at trial. He also asserts that trial counsel did not send an investigator to personally interview Love but instead relied on the State's investigators' report.

Trial counsel testified that he planned to present an alibi defense at trial because of the petitioner's assertions regarding where he was at the time of the offenses. Trial counsel said that the petitioner provided the name of Dafany Love as his only alibi witness. Trial counsel's investigator attempted to locate Love but was unable to find her. However, after

trial counsel gave notice that he would be presenting an alibi defense, the State's investigators were able to locate Love, and counsel obtained a copy of her statement and spoke to one of the State's investigators regarding the interview. Trial counsel's investigator was also able to speak to Love, and they determined that she would not be a good alibi witness because "she said she didn't have any knowledge of what we were talking about; that she was not with him; she was nowhere around him. . . . [S]he totally denied the whole thing. So that's not an alibi."

At the evidentiary hearing, Love testified that she and the petitioner were in Dyersburg at the time of the offenses and that the State's investigators who interviewed her lied by saying that she had told them she was not with the petitioner. Love also testified that she spoke to trial counsel on the phone prior to trial, and he asked her if she would testify on the petitioner's behalf. The post-conviction court found Love's testimony not credible that she was with the petitioner at the time of the offenses and that the State's investigators lied by saying she told them she was not with the petitioner. Therefore, we cannot conclude that trial counsel performed deficiently or that the failure to have Love testify at trial caused the petitioner any prejudice.

The petitioner asserts that his mother, Leatha Scott, should have been called as an alibi witness. However, Scott's testimony at the evidentiary hearing established that, although with the petitioner earlier in the day, she was not with the petitioner near the time of the offenses. She had also taken some "real strong pills" and was asleep at the time the police arrested the petitioner. She also acknowledged on cross-examination that she was not present for any of the petitioner's trial. We cannot conclude that the failure to have Scott testify caused the petitioner any prejudice as her testimony was not relevant to the petitioner's alibi.

The petitioner asserts that his brother, Anthony Jackson, should have been called as an alibi witness. Anthony testified that the petitioner and Love were at his house in Dyersburg from 6:30 or 7:00 p.m. until 8:30 or 9:00 p.m. on the day of the offenses. However, Anthony admitted that he did not go to the police after the petitioner was arrested to inform them that the petitioner could not have committed the offenses. The post-conviction court found Anthony's testimony not credible; therefore, we cannot conclude that the failure to have Anthony testify at trial caused the petitioner any prejudice.

The petitioner also asserts that his brother, Marvin Jackson, should have been called as an alibi witness. However, Marvin's testimony established that he was with the petitioner earlier on the day of the offenses, but not at the time of the offenses. Marvin testified that he called Anthony's cell phone later that evening and spoke to the petitioner while he was in Dyersburg. However, Anthony testified that only he, and not the petitioner, spoke to

Marvin when he called. Trial counsel testified that he would have subpoenaed Marvin to testify at trial had he been able to provide the petitioner with an alibi. The post-conviction court accredited counsel's testimony; as such, we cannot conclude that trial counsel rendered deficient performance for failing to have Marvin testify, or that such caused the petitioner prejudice.

The petitioner also insinuates that he was forced to testify because trial counsel did not present his alibi defense. However, the petitioner admitted at the hearing that it was his decision to testify and that his testifying was always a possibility going into the trial.

## B. Jury Instruction

The petitioner argues that trial counsel rendered ineffective assistance by failing to object to an inappropriate jury instruction on circumstantial evidence and failing to preserve the issue for direct appeal. He asserts that the given charge, "'It is not necessary that each particular fact be proved beyond a reasonable doubt if enough are proved to satisfy the jury of all the facts necessary to constitute the crime charged[,]'" allowed the jury to "find guilt based upon a degree of proof below that required by the Constitution." The State asserts that the petitioner has waived the issue for failing to include the trial transcript in which the instruction was given or a copy of the instruction in the appellate record.

We agree with the State that the petitioner has waived this issue for failing to ensure a complete record was provided for our review. At the conclusion of the post-conviction hearing, the petitioner's attorney asked the court to enter as exhibits transcripts of the suppression hearing and trial. The post-conviction court introduced a transcript of the suppression hearing as Exhibit 9 and the trial as Exhibit 10. The court noted that the trial transcript was three volumes. However, only the suppression hearing and first volume of the trial transcript are included in the appellate record, neither of which contain the trial court's charge to the jury. In his brief, the petitioner repeatedly references volumes V and VI of the trial transcript. It is the duty of the appealing party to prepare an adequate record for appellate review. Tenn. R. App. P. 24(b). "When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). In the absence of an adequate record on appeal, this court must presume that the trial court's actions are correct. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

Wavier notwithstanding, the instruction, as recounted by the petitioner, was substantially similar to a charge on circumstantial evidence approved by our courts. See State v. Bane, 853 S.W.2d 483, 487-88 (Tenn. 1993); State v. Raymond Douglas Myers, Sr.,

-17-

No. M2003-01099-CCA-R3-CD, 2004 WL 911280, at *6-7 (Tenn. Crim. App. Apr. 29, 2004), perm. to appeal denied (Tenn. Nov. 8, 2004); State v. Phillip M. Mullins, No. M2002-02977-CCA-R3-CD, 2003 WL 23021402, at *2-3 (Tenn. Crim. App. Dec. 29, 2003), perm. to appeal denied (Tenn. June 1, 2004); State v. Travis J. Woods, No. E2001-01027-CCA-R3-CD, 2003 WL 21663682, at *6 (Tenn. Crim. App. July 16, 2003), perm. to appeal denied (Tenn. Dec. 8, 2003). As such, the petitioner has failed to prove that trial counsel performed deficiently or that any deficiency caused him prejudice.

## C. Prior Convictions

The petitioner argues that trial counsel rendered ineffective assistance by failing to object to the introduction of his prior sexual battery conviction on cross-examination. He asserts that the fifteen-year-old conviction had very minimal probative value, and "[c]ounsel's failure to object to the admission . . . was undoubtedly prejudicial to [the petitioner]'s credibility in the eyes of the jurors." The State argues that the petitioner has waived the issue for failing to present an adequate record for our review and that the petitioner failed to present any evidence at the evidentiary hearing to establish that the prior conviction was improperly used during cross-examination or prejudiced his case.

We conclude that the petitioner has failed to prove that counsel performed deficiently or that any deficiency caused him prejudice. The petitioner, as with the previous issue, failed to ensure that the record contained the relevant portion of the trial transcript that referenced the prior conviction. More importantly, he failed to present any evidence at the evidentiary hearing that the prior conviction was used improperly or prejudiced his case. At the hearing, the petitioner acknowledged that he had a prior sexual battery conviction and argued that the State had erroneously referred to convictions for "aggravated burglaries and possession of handguns." As to this issue, the post-conviction court found that the record showed the petitioner was charged with being a convicted felon in possession of a firearm; therefore, the State had to prove the petitioner's prior conviction as a necessary element of the offense. The record reveals no error in the post-conviction court's determination.

## D. Witnesses at the Suppression Hearing

The petitioner argues that trial counsel was ineffective for failing to subpoena his accusers, Kevin Wiseman and Kim Hughes, to testify at the suppression hearing, which resulted in the denial of his right to confrontation, and failing to preserve the issue for appeal. Sergeant James Fitzpatrick testified at the suppression hearing regarding his compilation of the photographic arrays in the case and the identifications by Wiseman and Hughes. At the evidentiary hearing, counsel testified that the suppression hearing was for "a Motion to Suppress the Photo Spread that was actually used to identify [the petitioner],"

and Sergeant Fitzpatrick testified in that regard.

After review, we conclude that the petitioner has failed to prove that counsel performed deficiently or that any deficiency caused him prejudice. The right to confrontation is a trial right and does not apply in suppression hearings. See State v. Bush, 942 S.W.2d 489, 511 (Tenn. 1997); see also Haggard v. State, 475 S.W.2d 186, 187 (Tenn. Crim. App. 1971) (noting that "[t]he 'confrontation' guaranteed by the United States Constitution is confrontation at trial"); Pennsylvania v. Ritchie, 480 U.S. 39, 52 (1987). Moreover, the petitioner offered no proof as to how the outcome of his case would have been different had Wiseman and Hughes testified at the suppression hearing. As to this issue, the post-conviction court found that there was no evidence in the record to support the petitioner's claim, and we agree.

### E. Prosecutor's Statements Regarding Post-Arrest Silence

The petitioner argues that trial counsel was ineffective for failing to object to the prosecutor's comments concerning his post-arrest silence and failing to preserve the issue for appeal. However, the petitioner has failed to prove that trial counsel performed deficiently as he failed to specify the allegedly improper statements or ensure that the pertinent portions of the trial transcript were included in the appellate record. In any event, the record indicates that the petitioner may be referring to a statement by the prosecutor pointing out that the first time the petitioner told his story was when he testified at trial. In that regard, trial counsel testified at the evidentiary hearing that, when a defendant elects to testify and has made no previous statement, it is a common tactic by the prosecution to point out that it is the defendant's first time telling his story. Counsel said that such tactics carry very little weight and objecting to the prosecutor's question would only draw more attention to it. The post-conviction court concluded that trial counsel made an appropriate tactical decision to not object to the prosecutor's statement. The record supports this determination.

### F. Prosecutor's Misstatements Regarding the Facts

The petitioner argues that trial counsel was ineffective for failing to object to the prosecutor's statements in closing argument to facts not in the record and failing to preserve the issue for appeal. The petitioner asserts that the prosecutor's statement that the petitioner took the victim's car keys during the encounter was not supported by the evidence.

The petitioner failed to ensure that the transcripts of the closing arguments were included in the record on appeal; therefore, we are unable to review the allegedly inappropriate comments. In any event, the portion of the trial transcript that is available, as well as our opinion on direct appeal, show that Kevin Wiseman testified that three men,

including the petitioner, approached him and his brother, Jesse Windom, in the car lot. He said that he heard the petitioner start the Lexus, even though he did not specifically see him get the keys. However, he later testified that the men got the keys to the Lexus from Windom's person. Wiseman then, on cross-examination, again testified that he did not see the petitioner obtain the keys but saw him "crank up the Lexus." "A prosecutor's closing argument may be based upon reasonable inferences drawn from the evidence." State v. Henretta, 325 S.W.3d 112, 126 (Tenn. 2010). In light of Wiseman's testimony, it was reasonable for the prosecutor to tell the jury in closing argument that the petitioner obtained the keys from the victim. Thus, we discern no deficiency in trial counsel's performance for failing to object to the prosecutor's statement. Moreover, as found by the post-conviction court, the "[p]etitioner has not demonstrated how [c]ounsel's failure to object to any possibly misconstrued facts during the State's closing arguments prejudiced him."

### G.  Prosecutor's Misstatement of Prior Convictions

The petitioner argues that trial counsel was ineffective for failing to object to the prosecutor's misstatement of the petitioner's prior convictions and criminal history by saying that the petitioner "had been convicted of aggravated burglaries and possession of handguns." He asserts that "[s]uch statements unfairly characterized [him] as violent and/or dangerous in the eyes of the jury."

However, the petitioner failed to ensure the transcript of the closing arguments was included in the record on appeal for this court to review the prosecutor's exact statement. In any event, the petitioner failed to prove that trial counsel performed deficiently as he did not show that he had not been convicted of offenses reasonably characterized as that stated by the prosecutor. Our opinion on direct appeal recites the petitioner's criminal record to include convictions for, among other things, second degree burglary.[2] Under our prior criminal code, second degree burglary was the burglary of a dwelling house. See Tenn. Code Ann. § 39-3-403(a) (1986). Aggravated burglary under our current code is burglary of a habitation. Id. § 39-14-403(a) (2006). Moreover, the petitioner received a fifteen-year sentence on the second degree burglary convictions, the maximum provided for by the former statute. The record is silent as to whether the petitioner received that sentence because he possessed a handgun during the commission of the burglary, see id. § 39-3-403(3), or for other reasons. In addition, the petitioner offered no showing that such misstatement by the prosecutor, if deemed as such, in the scope of an entire closing argument, prejudiced his case.

---

[2]The offenses occurred prior to the 1989 Sentencing Reform Act.

## H.  Comments on Lesser-Included Offenses

The petitioner argues that trial counsel was ineffective for failing to object to the State's comments to the jury regarding its consideration of lesser-included offenses and failing to preserve the issue for direct appeal.  The petitioner contends that the State "advised the jury that they must not consider the lesser included offenses, despite the fact that it is the function of the Court, not the attorneys, to instruct the jurors on application of the law."

Again, the transcript of the State's closing argument was not included in the record on appeal; therefore, we are unable to evaluate the prosecutor's specific comment.  It appears from the petitioner's testimony at the evidentiary hearing that the prosecutor argued that the petitioner was guilty of first degree murder, and any other verdict would essentially be a not guilty verdict.  However, such argument can be reasonably viewed as a contention by the State that the facts fully supported a first degree murder conviction.  Moreover, we cannot conclude that such comment prejudiced the petitioner's case because the trial court presumably instructed the jury as to its consideration of lesser-included offenses and answered the jury's questions regarding lesser-included offenses in accordance with the law.

## I.  Late Disclosure of a Witness

The petitioner argues that trial counsel was ineffective for failing to object to the State's "late and untimely disclosure of Brady v[.] Maryland witness statement materials and failure to request a recess for the purpose of reviewing the prior statements of witness Kim Hughes, the [S]tate's identification witness."

Although the petitioner references it in his brief, he failed to include the portion of the trial transcript where the State disclosed the witness statement and the trial court granted a recess for the parties to review the information.  In any event, the petitioner has failed to show how his case was prejudiced due to the late disclosure of Hughes' statement.  This court has previously addressed the difference between delayed disclosure of evidence and complete nondisclosure of evidence:

> Indeed, when there has been a delayed disclosure of evidence, as opposed to a complete nondisclosure, Brady is normally inapplicable unless the delay itself causes prejudice.  See State v. Caughron, 855 S.W.2d 526, 548 (Tenn. 1993); State v. Joan Elizabeth Hall, No. 01C01-9710-CC-00503, 1999 WL 34782, at *9 (Tenn. Crim. App. at Nashville, Jan. 28, 1999).  When there has been a delayed disclosure, as opposed to a nondisclosure, the appellant must establish that the delayed disclosure prevented him from using the disclosed material effectively in preparing and presenting his case.  Caughron, 855

S.W.2d at 548.

State v. Larry Boykin, No. E2005-01582-CCA-R3-CD, 2007 WL 836807, at *13 (Tenn. Crim. App. Mar. 20, 2007), perm. to appeal denied (Tenn. Aug. 13, 2007). The petitioner acknowledged that trial counsel received the material during trial and that the trial court granted a recess, which allowed counsel time to review the material. The petitioner has failed to show how, or even allege, the delay in receiving the materials or trial counsel's failure to discuss the materials with him prejudiced his case.

## II. Allegations Against Appellate Counsel

### A. Failure to Appeal Instruction on Lesser-Included Offenses

The petitioner argues that appellate counsel was ineffective for failing to cite and rely on the Tennessee Supreme Court opinion, State v. Ely, 48 S.W.3d 710 (Tenn. 2001), which held that criminally negligent homicide was a lesser-included offense of felony murder and premeditated first degree murder.

As to this issue, the post-conviction court noted that, in Ely, the trial court had refused to instruct the jury on any lesser-included offenses to felony murder, including second degree murder, as opposed to the petitioner's case where the jury was instructed on several lesser-included offenses, including second degree murder. Given that the jury was instructed on several lesser-included offenses but did not reduce the charge below first degree murder, we fail to see how the petitioner was prejudiced by the failure to charge the jury on an even lesser charge. Therefore, we cannot conclude that appellate counsel rendered ineffective assistance in this regard.

### B. Failure to Appeal Exclusion of Court TV Videotape

The petitioner lastly argues that appellate counsel was ineffective for failing to appeal the trial court's exclusion of videotape evidence of his pre-arrest witness identification recorded by Court TV. The petitioner explained that Kevin Wiseman's initial identification of him was recorded as part of a television program for Court TV. He claimed that the "footage would have revealed to the jury that Mr. Wiseman was quite tentative and uncertain during the selection process, when theoretically the details of the events would have been much more recent and clearer in his memory."

The record does not suggest a reasonable probability that an appeal of this issue would have been successful. At trial, counsel for the co-defendant attempted to enter the Court TV tape to show inconsistencies in Wiseman's ability to identify the co-defendant.

The prosecutor argued that the video could not be authenticated because Wiseman's picture was blurred out. The video was played for the court in a jury-out hearing. The court observed that the video was "dramatized and misleading" and had been edited to utilize split screens and different angles. The court described the video as a "commercialized sensationalized Hollywood film," not "an objective constantly running camera for C-SPAN or for some civics class." The court also found that the video did not impeach Wiseman, as it showed him making an identification of the co-defendant. There was no real discussion concerning Wiseman's identification of the petitioner, but the discussion suggests that questions concerning the confidence of Wiseman's identification primarily involved only the co-defendant. The court excluded the tape but allowed the parties to ask Wiseman questions about it on cross-examination, noting that the parties could renew their request if Wiseman said something directly contrary to what was shown on the video. After Wiseman's testimony, the court noted that Wiseman had testified consistently with what was reflected on the video.

The admission of evidence generally lies within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. See State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004); State v. Gilliland, 22 S.W.3d 266, 270 (Tenn. 2000); State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999). Given the evidence before us, we simply fail to see, had the issue been appealed, any reasonable probability that the reviewing court would have determined that the trial court abused its discretion in excluding the Court TV videotape. Therefore, we cannot conclude that appellate counsel was ineffective in this regard.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE